UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| QL2 SOFTWARE, LLC, a Delaware limited liability company, | NO. C17-1489-JPD |
| Plaintiff, | |
| v. | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| THOMAS LAVEAU, an individual, | |
| Defendant. | |

## I.    INTRODUCTION AND SUMMARY CONCLUSION

Plaintiff QL2 Software, LLC ("QL2" or "plaintiff") seeks a declaration that its former employee, defendant and counter-claimant Thomas Laveau ("Mr. Laveau" or "defendant") no longer has any right, title or interest in a profit-sharing plan for Incentive Unit Members of QL2 (the "Incentive Units") or any right to commissions or bonus payments following the termination of his employment on May 15, 2017. Dkt. 1 at 5. Mr. Laveau asserts numerous counterclaims against QL2, which ultimately ask the Court to find that he did not forfeit his Incentive Units when he was involuntarily terminated, and that he is entitled to further commissions based upon payment received by QL2 following his termination. Dkt. 47 at 2. The parties have filed cross-motions for summary judgment. Dkt. 35; Dkt. 44. After careful consideration of the parties' motions, the governing law and the balance of the record, the

Court GRANTS QL2's motion for summary judgment, Dkt. 44, DENIES Mr. Laveau's motion for partial summary judgment, Dkt. 35, and DISMISSES this action with prejudice.

## II.     BACKGROUND

### A.     Factual History

#### 1.     *Mr. Laveau's Employment and Compensation Package at QL2*

In August 2004, Mr. Laveau began working for QL2 and its predecessor, QL2 Software, Inc., as the sales director for its European branch, QL2 Europe Limited ("QL2 Ltd."), based in the United Kingdom. Dkt. 25 at ¶ 5 (Mr. Laveau's Counterclaims); Dkt. 35-2 (Laveau Decl.) at ¶ 5. QL2 Software, Inc. was a software development company specializing in real-time search technology and analytical tools marketed towards business enterprises. *Id*. During his thirteen years of employment with the QL2 organization, Mr. Laveau worked in various capacities for the QL2 sales department, including expanding the sales reach of airline and travel-related business. *Id*. at ¶ 6.

As part of his compensation, Mr. Laveau received 100,000 fully-vested shares of QL2 Software, Inc. stock, which QL2 Software, Inc.'s managers represented to be worth approximately 2.5% of the company. Dkt. 25 at ¶ 7; Dkt. 35-2 (Laveau Decl.) at ¶ 6. When QL2 Software, Inc. filed for bankruptcy in January 2010, substantially all of its assets were transferred to Copernicus Holdings, LLC, as part of a plan of reorganization approved by the United States Bankruptcy Court for the Western District of Washington. The company underwent a two-step merger pursuant to the plan, with the surviving entity being the plaintiff, QL2 Software, LLC. Dkt. 45 (Hale Decl.) at ¶ 3.

Months prior to this merger, during QL2 Software, Inc.'s bankruptcy, Charles Hale (who is now the President of QL2 Software, LLC) offered to purchase all of Mr. Laveau's shares in QL2 Software, Inc. for $20,000. Dkt. 25, Ex. A at 2. Mr. Laveau agreed, and entered

into a written agreement on May 5, 2010 to exchange the shares for $20,000 cash prior to QL2 Software, Inc.'s merger with QL2 Software, LLC. *Id. See also* Dkt. 46 (Bugbee Decl.), Ex. A (Laveau Dep.) at 131:1-132:11; Dkt. 35-2 (Laveau Decl.) at ¶ 10.

Following the bankruptcy and merger, Mr. Laveau continued in his role with the sales department of QL2 Ltd. He also negotiated for, and was granted, 150 Incentive Units in QL2 Software, LLC, which were fully vested on September 1, 2010. Dkt. 25 at ¶ 24.[1] Mr. Laveau did not consult with an attorney regarding the terms of the Incentive Unit Grant Agreement. Dkt. 35-2 (Laveau Decl.) at ¶ 18.

When Mr. Laveau did engage in an email exchange about the Incentive Units with several members of QL2 management, including Mr. Hale, Mr. Hill, and his immediate supervisor Mr. Campbell, Mr. Laveau asked whether his wife would inherit his Incentive Units if he were to die. Dkt. 35-2 (Laveau Decl.) at ¶ 28. Mr. Hill responded, "The answer to your question is that the interests are fully vested, but they go away if you leave the company for any reason (including death)." *Id*. at ¶ 29. When Mr. Campbell commented that "I truly agree that if I was to walk away then I walk away from equity," but that he believed death was "an extraordinary event that warrants special treatment," Mr. Hill responded that "I think we agree that death is a special circumstance that probably warrants special treatment of some kind." *Id.* at ¶¶ 30-31. However, QL2 did not ultimately agree to any kind of modification or amendment to the Operating Agreement, or any sort of key man insurance. *Id*. at ¶ 31. *See also* Dkt. 35, Ex. 12 (May 26, 2012 email exchange among Mr. Hale, Mr. Hill, Mr. Campbell, and Mr. Laveau).

---

[1] QL2 actually issued 150 Incentive Units to Mr. Laveau in February 2012, with the transaction backdated to September 1, 2010. Dkt. 25 at ¶ 24. Mr. Laveau asserts that he finally executed the document on April 20, 2012, and emailed it back to Mr. Hill and Mr. Hale. Dkt. 35, Ex. 11.

Mr. Laveau's receipt and ownership of the Incentive Units was subject to the Incentive Unit Grant Agreement ("Grant Agreement"). Dkt. 25, Ex. B at 4. Pursuant to the Grant Agreement, all the terms and conditions in QL2's Amended and Restated Limited Liability Agreement (the "Operating Agreement") were "incorporated into [the] Grant Agreement in their entirety." *Id.* By entering into the Grant Agreement, Mr. Laveau indicated that he "acknowledges receipt of, and understands and agrees to, [the] Grant Agreement and the Operating Agreement." *Id.*

The Operating Agreement provides that Incentive Units are "equity interests" or "profit interests" in QL2, which are "subject to . . . forfeiture." Dkt. 25, Ex. C at ¶ 3.3(a)-(b). Most significantly in this case, the Operating Agreement provides that "[u]pon an Incentive Unit Member ceasing to provide services as an employee, consultant or advisor to the Company and its Subsidiaries for any reason, including death or disability, any Incentive Units held by such person immediately shall be forfeited to the Company and neither such Person nor such Person's estate or executor shall have any further rights with respect to such Incentive Units." *Id.* at ¶ 3.3(d). However, Mr. Laveau asserts that he "had no reason to believe that QL2 believed that they had the ability to cause forfeiture of my Incentive Units by terminating my employment with QL2." Dkt. 35-2 (Laveau Decl.) at ¶ 22. Mr. Laveau asserts that if he had understood that QL2 believed it had the power to erase his equity, he would have objected to such an equity plan, because it would have provided no sense of financial security. *Id.*

### 2. *Mr. Laveau's Move to California*

In his first counterclaim, Mr. Laveau asserts that "in late 2014, QL2 management asked Laveau to transfer to the United States to work as the vice president of international sales. To induce him to accept this transfer, QL2 represented to Laveau that his Incentive Units would remain intact and that he would retain the same compensation of a base salary with quarterly

commissions upon transfer." Dkt. 25 at ¶ 9. Mr. Laveau further represents that he "reasonably took QL2 at its word and accepted the transfer offer, leaving the United Kingdom for employment in California in January 2015." *Id.*

At oral argument on June 27, 2018, however, Mr. Laveau retreated from this version of the facts, and acknowledged that it was actually Mr. Laveau who approached QL2 to request the transfer to California. *See also* Dkt. 46 (Bugbee Decl.), Ex. A (Laveau Dep.) at 15:6-25. Emails exchanged between Mr. Laveau and his wife, as well as Mr. Laveau and his supervisor QL2 Chief Strategy Officer Paul Campbell, reflect that Mr. Laveau's decision to relocate to California was personal, based largely upon his family's desire to be close to his wife's family. Dkt. 45, Exs. A-C.[2] In fact, prior to approaching QL2 about the move, Mr. Laveau and his family had already applied for and received green cards from the United States. Dkt. 46, Ex. A (Laveau Dep.) at 63:13-19. Mr. Laveau's green card was issued in January 2014, and he testified that he and his family needed to move by mid-2015 before his green card expired. *Id.* at 66:10-25.

Similarly, Mr. Laveau's email correspondence with his supervisor, Mr. Campbell, does not reflect a request or suggestion by QL2 that Mr. Laveau should relocate in 2014 for the benefit of the company. Mr. Laveau stated, "As we have discussed over the past year, my goal was to move with QL2 to the US . . . this seemed to be a proposition attractive to the company and to me." Dkt. 45, Ex. B at 6. However, Mr. Laveau noted that he had recently sensed resistance by the company to his request, noting that "such a move now seems unpalatable to

---

[2] A December 2014 email from Mrs. Laveau explains that "we decided earlier this year, when our green cards came through, to head over to the US for a few years (and maybe permanently if we like it). My parents are getting older and my dad was very ill last year and as we were so far away, we decided that it would be nice to be closer to our family for the next few years." Dkt. 45, Ex. C. She further explained that she has other family who are local, and she grew up in Saratoga and loves the area. *Id.*

QL2 and, based upon my understanding of your position on some of the remuneration points thus far, less attractive to me." *Id.*

Mr. Campbell responded, "Yes, having your talent applied on this side of the globe is an attractive proposition but this means we then create a challenge for us in EMEA." *Id.* He further explained, "I would not say it's unpalatable for us but you have to agree that it creates a challenge for us in EMEA. Mind you, it's not a challenge that we cannot deal with if you decide to move to the US." *Id.* He later reemphasized QL2's willingness to accommodate *Mr. Laveau's* desire to move: "You have been building EMEA for over 8 years so moving to the US will create a challenge for us to solve once you move. As I said above, it's a challenge that we are happy to undertake in support of your move." *Id.* He later noted, "I'm sure we can work out some arrangement that supports, first and foremost, your family needs and secondarily QL2's needs." *Id.* at 7. Mr. Laveau left the United Kingdom to continue his employment for QL2 from a home office in California in January 2015. Dkt. 25 at ¶ 9.

### 3. *Mr. Laveau's Involuntary Termination on May 15, 2017*

Mr. Laveau entered into two consecutive one-year written compensation agreements in 2015 and 2016. These agreements provided that in addition to his base salary and Incentive Units, Mr. Laveau was entitled to commissions which were calculated and paid out at the end of each financial quarter. Dkt. 25 at ¶ 10. When it came time to negotiate a 2017 compensation plan, QL2 declined to formalize the agreement in writing, but orally represented that the 2016 compensation plan would be renewed with the same terms. *Id.* at ¶¶ 36-37. Thus, it is undisputed that the 2016 written compensation plan was extended, and still in effect when Mr. Laveau's employment was terminated.

In May 2017, QL2 sold off the entirety of the airline portion of its business, in which Mr. Laveau primarily worked, to a competitor, Infare. *Id*. at ¶ 11.[3] Just prior to the company-wide announcement, Mr. Laveau was informed that his employment with QL2 would cease as of May 15, 2017, but he would begin employment with Infare in the same sales capacity he had previously occupied with QL2. *Id*. at ¶ 39. QL2 then terminated Mr. Laveau as an employee on May 15, 2017. *Id*. at ¶¶ 11, 38-39. On May 22, 2017, Mr. Laveau learned that as a result of his termination, QL2 had extinguished his Incentive Units - which he believed to have been worth at least $1 million - pursuant to the Operating Agreement. *Id*. at ¶¶ 11, 38-39.[4] At oral argument, Mr. Laveau conceded that there was nothing improper about QL2's decision to sell the business or to terminate Mr. Laveau's employment. Moreover, the record contains no such suggestion.

When his employment with QL2 ended, Mr. Laveau immediately began working for Infare, where he currently receives substantially similar compensation and performs similar functions as those he provided to QL2, although he does not have any equity interests from Infare. Dkt. 35-2 (Laveau Decl.) at ¶ 34; Dkt. 46 (Bugbee Decl.), Ex. A (Laveau Dep) at 43:6-10. Mr. Laveau was paid his final salary and a pro-rated bonus for the second quarter of 2017 by QL2. Dkt. 45 (Hale Decl.) at ¶ 9. Although Mr. Laveau agreed during his deposition that he had been paid everything he was owed up through the date of his termination with respect to commissions, in his counterclaim, Mr. Laveau asserts that he is still owed approximately $108,915 in outstanding commissions under his 2017 compensation plan with QL2 for

---

[3] This sale of a portion of the business to Infare did not constitute a "dissolution event" under section 11.1 of the Amended Operating Agreement, as the sale was only of a portion of QL2's business. Dkt. 45 (Hale Decl.) at ¶ 10.

[4] Specifically, QL2 principal Charles Hale informed Laveau that his Incentive Units would not entitle him to any portion of the Infare transaction proceeds. *Id*. at ¶ 43.

payments made to the company following his termination.  Dkt. 46 (Bugbee Decl.), Ex. A (Laveau Dep) at 62:7-14; Dkt. 25 at ¶ 45.  Specifically, Mr. Laveau asserts that "prior to approximately 2013, my compensation plan at QL2 had an explicit provision addressing payments of commissions [for 30 days] in the event my employment at QL2 was terminated." Dkt. 49 (Supp. Laveau Decl.) at ¶ 5.  Specifically, the former compensation plan provided as follows:

> Termination of Employment – A signed agreement must be received by the last day of employment in order to be eligible for a commission payout to a former employee.  If a signed agreement was in place prior to [a] former employee's last day of employment and a payment is received from the customer within 30 days of the former employee's last day of employment, 2/3 of the commission payments on such payments will be paid to the former employee.  The remaining 1/3 commission will be paid to the sales person taking on the responsibilities for the account.  No commission payments will be made to the separated employee based on any payments received from customers more than 30 days after the former employee's last day of employment.

*Id*. at ¶ 5; Dkt. 49, Ex. 15 at 2 (Mr. Laveau's 2011 compensation plan).  Mr. Laveau acknowledges that this provision was no longer included in later compensation plans, including his 2015 or 2016 plan.  Dkt. 49 (Supp. Laveau Decl.) at ¶ 5.  He believes that "based on the removal of this provision from my later compensation plans, I understood that I would be entitled to commissions [even beyond 30 days after my last day of employment] even if QL2 terminated my employment."  *Id*.

     B.    <u>Procedural History</u>

     On October 3, 2017, QL2 Software filed the instant complaint, seeking a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Mr. Laveau no longer has any rights to the Incentive Units, or related payments.  Dkt. 1 at 5.  In addition, QL2 seeks a declaration that Mr. Laveau is not owed any further bonuses or commissions.  *Id.*

On December 15, 2017, with leave of the Court, Mr. Laveau filed ten counterclaims against QL2. Dkt. 25. Specifically, Mr. Laveau alleges violation of California Labor Code §§ 201 *et seq*. and 970, and state law claims of breach of contract, *quantum meruit*, promissory estoppel, breach of the implied covenant of good faith and fair dealing, and imposition of a constructive trust. *Id*. Mr. Laveau filed the instant motion for partial summary judgment on April 5, 2018, seeking judgment as to "QL2's declaratory judgment cause of action and Laveau's first (solicitation of employment by misrepresentation pursuant to California Labor Code § 970), second (fraud), fourth (promissory estoppel; incentive units), sixth (breach of contract; Incentive Unit Grant Agreement), eighth (breach of implied duty of good faith and fair dealing), ninth (quantum meruit), and tenth (constructive trust) causes of action." Dkt. 35 at 2.[5]

QL2 opposes Mr. Laveau's motion, and moves for summary judgment as to both of its claims against Mr. Laveau as well as all ten of Mr. Laveau's counterclaims. Dkt. 44 at 1-2. Specifically, QL2 points out that all of the claims in this case, including all ten of Mr. Laveau's cases of action, relate either to (1) Mr. Laveau's assertion that following termination of his employment, he was entitled to continue to receive commissions from QL2 under its bonus program, or (2) Mr. Laveau's claim that he still has rights to Incentive Units in QL2 pursuant to the Operating Agreement, despite his termination of employment with the company. Because

---

[5] Thus, Mr. Laveau is not seeking summary judgment as to his third, fifth, and seventh counterclaims. His third counterclaim asserts that promissory estoppel applies with respect to QL2's alleged withholding of commissions rightfully due to Mr. Laveau under the 2017 compensation agreement. Dkt. 25 at 11. Mr. Laveau's fifth cause of action alleges that Mr. Laveau was owed his outstanding salary and commissions immediately upon his termination on May 15, 2017 pursuant to California Labor Code, and because he has not yet been paid the outstanding commissions within the time required by §§ 201 and 202, he is entitled to "waiting time penalties" and interest. *Id*. at 13. Finally, Mr. Laveau alleges in his seventh cause of action that QL2's failure to pay the additional commissions allegedly owed to him constituted a breach of his 2017 compensation plan. *Id*. at 14-15.

all of Mr. Laveau's causes of action attempt to assert rights to ongoing commissions or Incentive Units, and such rights (or lack thereof) are fully established by written contracts between the parties, QL2 asks the Court to grant QL2's motion for summary judgment, deny all of Mr. Laveau's claims, and dismiss this action in this entirety. Dkt. 44 at 1-2.

## III.    DISCUSSION

### A.    Legal Standard for Summary Judgment

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir. 2000). A moving party is entitled to summary judgment when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue of fact is "genuine" if it constitutes evidence with which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). That genuine issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

In response to a properly supported summary judgment motion, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts demonstrating a genuine issue of material fact for trial and produce evidence sufficient to establish the existence of the elements essential to his case. *See* Fed. R. Civ. P. 56(e). A mere scintilla of evidence of insufficient to create a factual dispute. *See Anderson*, 477 U.S. at 252. *See also Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) ("[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits.").

**B.**     <u>Mr. Laveau's Right to Incentive Units in QL2 Were Forfeited Upon His Termination, Pursuant to the Plain Language of the Operating Agreement</u>

The parties' primary disagreement in this case is whether QL2 improperly canceled Mr. Laveau's 150 Incentive Units when it terminated his employment on May 15, 2017. In his sixth and eighth counterclaims, Mr. Laveau asks the Court to find that QL2 breached the Incentive Unit Grant Agreement by refusing to pay him the Incentive Unit proceeds and distributions owed him pursuant to the terms of the agreement. Dkt. 25 at 13-14. QL2 argues that the unambiguous terms of the Operating Agreement, which was incorporated into the Grant Agreement in its entirety, establish that Mr. Laveau's 150 Incentive Units were forfeited upon his termination, and therefore Mr. Laveau no longer has any right to the Units themselves or to any related payment. *See* Dkt. 25, Ex. B at 4.

It is undisputed that the Operating Agreement is governed by the law of Delaware. Dkt. 35, Ex. 13 sec. 12.4. The Supreme Court of Delaware has long held that "Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)). When interpreting a contract, Delaware courts "will give priority to the parties' intentions as reflected in the four corners of the agreement," construing the agreement as a whole and giving effect to all its provisions. *GMG Capital Inv., LLC. v. Athenium Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). "Under standard rules of contract interpretation, a court must determine the intent of the parties from the language of the contract." *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003).

The parties agree that extrinsic evidence is not necessary or admissible to interpret the Operating Agreement in this case. To the extent that Mr. Laveau argues that there could be an ambiguity in the contract (but only if the Court were to disagree with his proposed interpretation), this Court finds none. Contractual ambiguity exists "'[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.'" *GMG Capital Inv., LLC. v. Athenium Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)). Here, the Court finds that the operative language in section 3.3(d) of the QL2 Amended Operating Agreement is plain and unambiguous, and not susceptible to any alternative meaning.

As noted above, the Incentive Unit Grant Agreement "is subject to all the terms and conditions set forth . . . [in] the Operating Agreement, which is incorporated into [the] Grant Agreement in their entirety." Dkt. 25, Ex. B at 4. Section 3.3(d) of the Operating Agreement provides as follows:

> Upon an Incentive Unit Member *ceasing to provide services as an employee . . . for any reason, including death or disability*, any Incentive Units held by such person immediately shall be forfeited to the Company and neither such Person or such Person's estate or executor shall have any further rights with respect to such Incentive Units.

Dkt. 25, Ex. C at 20 (emphasis added).

Mr. Laveau focuses on the phrase "ceasing to provide services," and argues that the word "cease" is used as a transitive verb in § 3.3(d). Mr. Laveau contends that the word "cease" means to voluntarily stop doing something, *i.e.*, it "means the Incentive Unit Member stops providing services to QL2 and [the] cause of the stoppage originated with [the] Incentive Unit Member." Dkt. 35-1 at 13. Mr. Laveau asserts that QL2's inclusion of the phrase, "including death or disability," demonstrates that the meaning of the word "cease" must include the concept of

volition. Specifically, "[b]ecause death and disability are not normally characterized as voluntary reasons for ceasing to provide services, QL2 appears to have concluded it was necessary to add the clause clarifying the scope of 'cease' as including death and disability." *Id*. at 14. Mr. Laveau further asserts that "if QL2 had intended that Incentive Unit Members would forfeit their Incentive Units if QL2 terminated him or her, QL2 would have drafted § 3.3(d) to explicitly provide that 'ceasing to provide services' includes ceasing to provide services because of 'death, disability, or involuntary termination.'" *Id*. at 15. Finally, Mr. Laveau argues that QL2 should not be permitted to retroactively rewrite a contract it drafted itself to add "termination" to § 3.3(d). *Id*.

QL2 responds that because § 3.3(d) provides that an Incentive Unit Member forfeits his or her Incentive Units if he or she ceases to provide services to QL2 "for any reason," this necessarily includes the concept of ceasing to provide services involuntarily because of the termination by the employer. QL2 contends that this interpretation of "ceasing to provide services" is most consistent with the common understanding of the word "cease," which does not require voluntary or willful action. Rather, QL2 argues that "to cease" means simply to "come or bring to an end." Dkt. 44 at 18. Moreover, QL2 points out that the Operating Agreement goes on to make it expressly clear that Incentive Units are forfeited if the employee's services end "*for any reason*, including death or disability," both of which are usually involuntary occurrences. *Id*. at 19.[6] QL2 asserts that the word "include" means "comprise or contain as part of a whole," and therefore "death and disability (generally involuntary acts) are part of the whole of 'ceasing to provide services for any reason,' meaning

---

[6] For example, the agreement does not say "cease . . . for any reason, or death or disability," as if involuntary death or disability were different from ceasing to provide services." Dkt. 44 at 19.

that involuntary actions are included in that phrase." *Id*. Because Mr. Laveau stopped

providing services to QL2 on May 15, 2017, following his involuntary termination, QL2

contends that the plain language of the contract dictates that he forfeited his Incentive Units as

of that date. *Id*. at 18.

The Court finds that QL2's interpretation of § 3.3(d) is correct. Mr. Laveau's focus on

the meaning of the word "cease" fails to acknowledge the significance of the clarifying phrase,

"for any reason." As QL2 points out, the common meaning of the word "cease" means "come

or bring to an end."[7] The word "cease" may or may not involve voluntary or willful action.

But more importantly in the context of § 3.3(d) of the Operating Agreement, the meaning of

the word "cease" is clarified by the words, "for any reason, including death or disability."

Because death and disability, two involuntary ways that an employee's ability to provide

services could end, are expressly included in the phrase "for any reason," there is nothing in

the plain language of § 3.3(d) that requires *voluntary* cessation of services by Mr. Laveau as a

predicate to forfeiting the Incentive Units.

Accordingly, QL2's motion for summary judgment as to the Incentive Units is

GRANTED. Dkt. 44. Mr. Laveau no longer has any right, title or interest in the Incentive

Units, and QL2 does not owe Mr. Laveau any funds as result of his forfeiture of the Incentive

Units upon his involuntary termination. Dkt. 44.

C. Mr. Laveau's Counterclaims Regarding the Incentive Units Lack Merit

Mr. Laveau's first, second, fourth, sixth, and eighth counterclaims, which relate to the

Incentive Units and the Grant Agreement, are also DISMISSED. Dkt. 25 at 13-14. As

discussed in more detail below, the Court does not find any evidence that QL2 induced Mr.

---

[7] *See* OXFORD LIVING DICTIONARIES, https://en.oxforddictionaries.com/definition/cease
(last visited July 2, 2018) ("the hostilities ceased and normal life was resumed").

Laveau to move to California, and therefore QL2 did not wrongfully - or fraudulently - induce Mr. Laveau to rely on false representations regarding retention of his Incentive Units following such a transfer as alleged in Mr. Laveau's first and second counterclaims. Dkt. 25 at ¶¶ 49, 53-60. In his fourth counterclaim, Mr. Laveau alleges that promissory estoppel should preserve his Incentive Units despite his involuntary termination, because "QL2 made the offer to preserve Laveau's Incentive Units with the intent of inducing Laveau to accept the United States transfer" and Mr. Laveau reasonably relied upon QL2's promises to his detriment. *Id.* at ¶ 69. Again, the Court finds no evidence of such inducement, or any wrongful conduct by QL2 that would trigger the principle of promissory estoppel with respect to the Incentive Units.

With respect to Mr. Laveau's sixth counterclaim, the Court finds that his Incentive Units were forfeited upon his termination pursuant to § 3.3(d) of the Operating Agreement, and therefore QL2 did not breach the Grant Agreement by effectuating this provision. With respect to his eighth counterclaim regarding the implied covenant of good faith and fair dealing, the Operating Agreement directly addresses the issue of when and how the Incentive Units are forfeited. As a result, there is reason for the Court to import an implied term (such as the implied covenant) to alter the rights expressly granted by the agreement. Mr. Laveau has not shown any breach of the implied convent of good faith and fair dealing in the Grant Agreement by QL2. Thus, Mr. Laveau's counterclaims regarding the Incentive Units lack merit, and are dismissed.

C.    Mr. Laveau's Right to Commissions Ended with his Termination by QL2

QL2's second claim for summary judgment asks the Court to declare that Mr. Laveau is not owed any bonuses or commissions following the termination of his employment, and to dismiss his numerous related counterclaims. Dkt. 44 at 10. It is undisputed that Mr. Laveau's 2016 Compensation Plan, which had been orally renewed with the same terms in 2017, entitled

Mr. Laveau to commissions, in addition to his base salary and Incentive Units. Dkt. 25 at ¶ 10. Although Mr. Laveau has not moved for summary judgment on this issue, Mr. Laveau's first, third, fifth, seventh, ninth, and tenth counterclaims essentially contend that QL2 has "unlawfully withheld Laveau's commissions worth approximately $108,915," and seek immediate payment of this sum. *Id*. at ¶ 12.

Specifically, Mr. Laveau's first counterclaim asserts that at the time QL2 induced him to transfer to the United States, QL2 management falsely misrepresented to Mr. Laveau that his commissions would be unaffected by the transfer. Dkt. 25 at ¶¶ 49-53. Mr. Laveau's third counterclaim asserts that because QL2 represented that Mr. Laveau's 2016 Compensation Plan was extended into 2017, which he relied upon by continuing to work for QL2, QL2 should be estopped from denying Mr. Laveau "wages" (*i.e.*, commissions) for work performed in 2017. Dkt. 25 at ¶¶ 63-66. Similarly, Mr. Laveau's fifth cause of action asserts that "upon his involuntary termination . . . Laveau was owed . . . approximately $108,915 in commissions," which was due on the date he was terminated pursuant to California Labor Code § 201. *Id*. at ¶ 78. His seventh cause of action alleges that QL2's failure to pay the commissions owed to him breached the 2016 Compensation Plan, which had been orally extended into 2017. *Id*. at ¶ 88. Mr. Laveau's ninth cause of action for *quantum meruit* claims that because the 2016 Compensation Plan set forth exact calculations for commissions, these amounts represent a reasonable value for services provided by him to QL2 and should be enforced. Dkt. 25 at ¶ 98. Finally, his tenth counterclaim asks the Court to find that QL2 has been unjustly enriched by wrongfully withholding Mr. Laveau's commissions, and find that the funds have been held in "constructive trust" for Mr. Laveau. *Id*. at ¶ 104.

The Court GRANTS QL2's motion for summary judgment as to Mr. Laveau's counterclaims seeking damages for withheld commissions. Mr. Laveau has acknowledged that

he was paid all commissions earned through the date of his termination, and therefore the commissions at issue in his counterclaims relate to payments QL2 received from customers *after* his May 2017 termination. The 2016 Compensation Plan, which both parties agree was extended and continues to apply, provides that "[a] sales/account management *employee* is eligible to receive bonus commission payments each quarter as shown in Attachment A . . . Commissions will be paid quarterly . . . based upon payments received by the end of the preceding quarter. Commissions will be eligible to be paid once payment is received from the customer." Dkt. 25, Ex. E (emphasis added). The plain language of this Compensation Plan therefore creates two conditions for payment: (1) that an individual be an employee, and (2) that QL2 actually received payment from the customer.

When the Court asked Mr. Laveau's counsel during oral argument what language in the 2016 Compensation Plan creates Mr. Laveau's right to the commissions he is seeking in this case, counsel explained that there is no express language in the contract that creates this right. Rather, it is the *absence* of language saying that Mr. Laveau is *not* entitled to such commissions following his termination that he believes creates this right. Dkt. 59. As noted above, prior versions of QL2's compensation plan in effect several years prior to this dispute included an allowance for terminated employees to receive commissions for thirty days following the end of their employment based on amounts received by QL2 within that thirty-day period. *See* Dkt. 49, Ex. 15 at 2 (Mr. Laveau's 2011 compensation plan). However, as Mr. Laveau acknowledges, QL2 removed that 30-day tail from the QL2 compensation plan, and it was not included in either his 2015 or 2016 plan. Dkt. 49 (Supp. Laveau Decl.) at ¶ 5.

Mr. Laveau believes that based on the removal of this provision from his later compensation plans, he would be entitled payment of such commissions *indefinitely*, i.e., throughout the entire term of his former customer contracts, even if QL2 terminated his

employment. *Id.* This position strains credulity. It is undisputed that the plain language of the 2016 Compensation Plan does not confer upon Mr. Laveau any express and ongoing right to commissions from his former customer contracts once he was no longer an employee of the company. The Compensation Plan's silence does not create a contractual right to payment of commissions received by QL2 after his termination. Thus, Mr. Laveau's first, third, fifth, seventh, ninth, and tenth counterclaims, which all assert various theories of recovery based upon allegations of wrongfully withheld commissions by QL2, lack merit, and are DISMISSED with prejudice.[8]

        D.    <u>Mr. Laveau's First Counterclaim for Solicitation of Employment by Misrepresentation Fails as a Matter of Law</u>

Mr. Laveau's first counterclaim alleges that prior to 2015, Mr. Laveau was a QL2 employee in the United Kingdom office. However, "in late 2014, QL2 managers approached Laveau with an offer to relocate to the United States to work remotely as the company's vice president of international sales from a California home office." Dkt. 25 at ¶ 47. As noted above, Mr. Laveau alleges that QL2's representations that his Incentive Units and commissions would be unaffected by his transfer were false, and that he reasonably relied upon these false promises and relocated to the United States. *Id.* at ¶ 51. He asserts that by "making the false

---

    [8] The Court notes that Mr. Laveau appears to argue for the first time in his response to QL2's summary judgment motion that QL2 must pay him commissions based on the amount it received from Infare when QL2 sold a portion of its business containing some of Mr. Laveau's former customer accounts. Dkt. 47 at 17-20. As noted above, Mr. Laveau's 2016 Compensation Plan allows him to earn commissions based on customer payments, and the specific rate that applies to any given customer payments is variable depending on a multitude of factors. Dkt. 25, Ex. E at 66. His Compensation Plan further provides that "commissions will be eligible to be paid once payment is received from the customer." Dkt. 25, Ex. E at 64. There is no provision in the plan providing that Mr. Laveau would also be entitled to receive commissions based upon QL2's sale of a portion of its business that includes the relevant customer contracts to another company. *Id.* As a result, Mr. Laveau's claim is not only untimely under Fed. R. Civ. P. 8(a)(2), but it is a non-starter.

representations regarding Laveau's equity rights and commissions, [QL2] persuaded him to relocate for the purpose of employment in violation of California Labor Code § 970, entitling Mr. Laveau to double damages resulting from his induced relocation to the United States. *Id.* at ¶ 53.

As discussed above, during oral argument on the pending motions, Mr. Laveau retreated from the version of the facts presented in his counterclaims. He conceded, as he must in light of the email correspondence in the record as well as Mr. Laveau's deposition testimony, that it was actually Mr. Laveau who approached QL2 to request the transfer to California. Dkt. 46 (Bugbee Decl.), Ex. A (Laveau Dep.) at 15:6-25. Emails exchanged between Mr. Laveau and his wife, as well as his supervisor Paul Campbell, reflect that Mr. Laveau's decision to relocate to California was personal, based largely upon his family's desire to be close to his wife's aging parents. Dkt. 45, Exs. A-C.

For example, a December 2014 email from Mr. Laveau's wife to a real estate agent explained that "we decided earlier this year, when our green cards came through, to head over to the US for a few years (and maybe permanently if we like it). My parents are getting older and my dad was very ill last year and as we were so far away, we decided that it would be nice to be closer to our family for the next few years." Dkt. 45, Ex. C. She further explained that she has other family who are local, and she grew up in Saratoga and loves the area. *Id.* In fact, prior to approaching QL2 about the move, Mr. Laveau and his family had already applied for and received green cards from the United States. Dkt. 46, Ex. A (Laveau Dep.) at 63:13-19. Mr. Laveau's green card was issued in January 2014, and he testified that he and his family needed to move by mid-2015 or else his green card could have expired. *Id.* at 66:10-25.

In addition, Mr. Laveau has failed to produce evidence that any member of QL2 management attempted to persuade him to relocate to California. On the contrary, Mr.

Laveau's email correspondence with Mr. Campbell reflect concern on Mr. Laveau's part that his request for relocation to California "now seems unpalatable to QL2 and, based upon my understanding of your position on some of the remuneration points thus far, less attractive to me." Dkt. 45, Ex. B at 6.  Mr. Campbell responded, "Yes, having your talent applied on this side of the globe is an attractive proposition but this means we then create a challenge for us in EMEA." *Id.*   He further explained, "I would not say it's unpalatable for us but you have to agree that it creates a challenge for us in EMEA.  Mind you, it's not a challenge that we cannot deal with *if you decide* to move to the US." *Id.* (emphasis added).  He later reemphasized QL2's willingness to accommodate *Mr. Laveau's* desire to move: "You have been building EMEA for over 8 years so moving to the US will create a challenge for us to solve once you move.  As I said above, it's a challenge that we are happy to undertake in support of your move." *Id.*  He later noted, "I'm sure we can work out some arrangement that supports, first and foremost, your family needs, and secondarily QL2's needs." *Id*. at 7.

   As the record before the Court contains no evidence supporting Mr. Laveau's claim that QL2 attempted to solicit or persuade Mr. Laveau to move to California, no genuine issue of material fact precludes summary judgment on this issue.  Despite Mr. Laveau's unsupported assertion to the contrary in his first counterclaim, the personal and professional email correspondence in the record, as well as Mr. Laveau's own deposition testimony about his early and ongoing attempts to obtain a green card to move to the United States, show that when Mr. Laveau left the United Kingdom to continue his employment for QL2 from California in January 2015, it was QL2 that was accommodating *his* desire to move, and not the other way around.  Thus, the Court GRANTS QL2's motion for summary judgment and dismissal of Mr. Laveau's first counterclaim alleging solicitation of employment by misrepresentation pursuant to California Labor Code § 970.

# IV.    CONCLUSION

Accordingly, the Court GRANTS QL2's motion for summary judgment, Dkt. 44,

DENIES Mr. Laveau's motion for partial summary judgment, Dkt. 35, and DISMISSES

plaintiff's counterclaims, Dkt. 25, with prejudice.  Because none of plaintiff's counterclaims

presented a genuine issue of material fact to preclude summary judgment in this case, Mr.

Laveau's May 31, 2018 discovery motion, Dkt. 54, is DENIED as MOOT.

The Clerk is directed to send a copy of this Order to counsel for both parties.

DATED this 6th day of July, 2018.

JAMES P. DONOHUE
United States Magistrate Judge